## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **CLIFFORD LEON JORDEN,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:13-cv-02156-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On September 2, 2010, the claimant, Clifford Jorden, applied for disability insurance

benefits and supplement security income under Title II of the Social Security Act. (R. 280–87).

The claimant alleged that his disability began on August 18, 2010 because of his back problems,

shoulder problems, high blood pressure, high cholesterol, and carpal tunnel syndrome. (R. 317).

The Commissioner denied the claim on October 28, 2010. (R. 206–13). The claimant filed a

timely request for a hearing before an Administrative Law Judge, and the ALJ held an initial

hearing on December 14, 2011. (R. 162–202). The ALJ conducted a subsequent hearing on May

23, 2012. (R. 95–162).

On June 15, 2012, the ALJ issued an opinion finding that the claimant was not disabled

as defined by the Social Security Act and was, therefore, ineligible for insurance benefits and

supplemental security income. (R. 74–94). The claimant filed a request for review by the

Appeals Council on June 22, 2012. (R. 67–70). On October 11, 2013, the Appeals Council

denied the claimant's request. (R. 48–54). Accordingly, the ALJ's decision stands as the final decision of the Commissioner. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.   whether the ALJ properly assessed the testimony of the claimant regarding his pain and ability to work;

2.   whether the ALJ accorded proper weight to the testimony of the claimant's treating physicians, Dr. Aggarwal and Dr. Hicks.

3.   whether the ALJ properly found the claimant not to be disabled under the Medical-Vocational Rules.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if his substantial evidence supports his factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. THE LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to his pain, he must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding supported by substantial evidence in the record. *Id.* at 1562.

The ALJ must state with particularity the weight given to different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

unless he shows "good cause" the contrary. *Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

When an ALJ decides to discredit the opinion of a treating physician, he must articulate the specific reasons why the treating physician's opinion should not be controlling. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). If the ALJ articulates specific reasons for failing to give the opinion of a treating physician controlling weight and substantial evidence supports those reasons, the ALJ does not commit reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

Good cause for discrediting a treating physician's opinion does not exist merely because a non-examining physician reaches a different conclusion than the treating physician. *Johns v. Bowen*, 821 F.2d 551 (11th Cir. 1987). Good cause is present when the treating physician's opinion is not supported by evidence, the opinion is conclusory, or it is inconsistent with the doctor's own medical records. *Lewis*, 125 F.3d at 1440. Standing alone, the opinions of non-examining physicians do not amount to substantial evidence to discredit a treating physician's opinion. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987).

When the ALJ determines that a treating physician's opinion is not controlling, the ALJ must still evaluate the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

An ALJ may rely on the Medical-Vocational grids only in appropriate cases. An ALJ may not rely on the grids as controlling when the claimant is unable to perform a full range of work at a functional level or when the claimant has non-exertional impairments that significantly limit basic work skills. *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985). Although not required, "[t]he preferred method of demonstrating job availability when the grids are not controlling is through expert vocational testimony." *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985).

An ALJ may rely on the testimony of a vocational expert to establish that the claimant has the ability to adjust to other work available in the national economy. *Richter v. Comm'r of Soc. Sec.*, 379 F. App'x 959, 960 (11th Cir. 2010). When relying on such testimony, the ALJ must pose hypothetical questions to the vocational expert that consider all of the claimant's impairments. If the ALJ presents the vocational expert with an inadequate hypothetical, the vocational expert's testimony will not constitute substantial evidence. *Jacobs v. Comm'r of Soc. Sec.*, 520 F. App'x 948, 950 (11th Cir. 2013).

## V. FACTS

At the time of the ALJ's final decision, the claimant was fifty-one years old. (R. 87, 167). He has a high school education, completed trade school for welding, and also attended one year of college. (R. 167). The claimant's last employment position was as a finisher/inspector. In August 2010, the claimant ceased to work at that job after being injured. The claimant began drawing unemployment benefits, and although he searched for other jobs, he was unable to obtain one.  (R. 171–72). The claimant alleges disability based on his back problems, shoulder problems, high blood pressure, high cholesterol, and carpal tunnel syndrome. (R. 317).

*Physical Impairments*

Dr. Williams Hicks, the claimant's personal physician, has treated the claimant since at least 2007. Dr. Hicks referred the claimant to Dr. Rhett B. Murray at the Spine and Neuro Center based on the claimant's reports of pain in his shoulders. The claimant had been to this clinic before in 1995, presenting with symptoms of carpal tunnel syndrome, but the tests came back negative. On December 8, 2009, the claimant reported to Dr. Murray that he had intense pain in his shoulders that was worse on his right side. The claimant also complained of decreased grip strength in his hands. On a scale of one to ten, the claimant rated his pain as an eight, even after taking Lortab and an anti-inflammatory medicine. The claimant tested negative for Tinel's and Phalen's signs over his bilateral median nerves. (R. 515–617).

Dr. Seymour began treating the claimant after a referral from Dr. Hicks on April 20, 2009 to treat a right foot injury. In December of 2009, Dr. Morris Seymour referred the claimant to Dr. John Roberts at the Tennessee Valley Pain Clinic. On January 26, 2010, Dr. Roberts began primary treatment of the claimant's neck and left upper extremity shoulder pain. Dr. Roberts's evaluation of the claimant showed that degenerative joint and disc disease caused the pain in his neck and upper back, and an MRI revealed a small disc protrusion at two places on the spinal cord but no spinal cord or nerve root compromise. (R. 1000, 1057).

On February 19, 2010, the claimant went to see Dr. Sean Wallis, a chiropractor, after being referred by Dr. Seymour. Dr. Wallis diagnosed the claimant with cervical disc degeneration, cervical radiculopathy, and subluxations in the cervical and thoracic regions. To treat these conditions, Dr. Wallis utilized spinal manipulation, cervical decompression, and ultrasound. Dr. Wallis reported improvement in the claimant's neck tenderness, but noted that

the range of motion and tenderness in the shoulder had remained constantly impaired. (R. 436–44).

Dr. Hicks referred the claimant to Dr. John Bacon in Huntsville, Alabama for a surgical evaluation. On March 10, 2010, Dr. Bacon performed surgery to repair the claimant's left rotator cuff and alleviate his shoulder pain. The procedure was successful and the claimant began physical therapy at Dynamic Performance Physical Therapy, and continued in therapy for nearly three months. At the end of the treatment, the claimant had significantly increased the range of motion in his left shoulder and was judged to be progressing with intermittent pain. His potential for rehabilitation was considered "good." Dr. Bacon saw the claimant again on May 11, 2010. Dr. Bacon described the claimant as "much better" and noted that his pain "was much less." (R. 445, 749, 1025–54, 1389).

On July 13, 2010, Dr. Seymour examined the claimant after he complained that his shoulder and neck pain had returned. Dr. Seymour diagnosed the claimant with cervical stenosis and decided to see him again after he had received a series of epidurals from Dr. Roberts. Dr. Seymour performed a physical examination of the claimant and stated that he had a positive impingement sign, as he had external rotation to sixty degrees, abduction to sixty-five to seventy degrees, and could internally rotate his hands above his belt. Dr. Seymour also stated that a nerve conduction study showed that the claimant may have mild carpal tunnel syndrome symptoms. (R. 910, 1059).

Following the claimant's shoulder surgery, Dr. Bacon referred the claimant to Dr. Anthony Pitts, a spine specialist. The claimant saw Dr. Pitts on July 27, 2010 and August 10, 2010. At both appointments, the claimant described himself as independent and functional, while still experiencing some pain. Dr. Pitts prescribed Medrol Dosepak, which the claimant reported

relieved seventy percent of his pain. Some of the symptoms reappeared when the claimant attempted to decrease his dosage to a seven-day Medrol Dosepak. (R. 691–93).

Dr. Pitts referred the claimant to Dr. Anjaneyulu Alapati, a neurological specialist with Huntsville Hospital Neurological Associates. On August 6, 2010, Dr. Alapati ordered a nerve conduction study and found evidence of C5-6 radiculopathy with superimposed left carpal tunnel syndrome. This diagnosis was based on the slow conduction velocity in the claimant's left median sensory nerve across his palm to wrist and digit two to wrist segments. (R. 688).

Four days later, at the claimant's second visit with Dr. Pitts, the claimant reported that he was thirty-five percent better than before his first visit with Dr. Pitts. The claimant stated that he continued to work and that he had driven himself from Huntsville to the appointment in Birmingham that day. Dr. Pitts described the claimant as "functional," while still experiencing "some pain." (R. 693).

On August 12, 2010, Dr. Roberts administered steroid injections in both the claimant's cervical spine and shoulders. This treatment produced no lasting benefit in Dr. Roberts's judgment, based on the claimant's reported pain levels. The claimant stated the injections only provided a few days of relief before the pain returned. (R. 723, 740, 1057).

On August 24, 2010, however, Dr. Seymour saw the claimant again for a follow-up visit on his neck pain. Dr. Seymour noted that the claimant reported that the injections had produced "significant improvement," though the claimant reported still experiencing some pain. (R. 1059).

To determine the source of the claimant's continuing pain, Dr. Hicks referred him to an orthopedist. Dr. John Greco examined the patient and concluded that the claimant's pain was likely the result of a bone spur on his neck with substantial scar tissue. On August 31, 2010, Dr. Greco performed a subacromial decompression and AC joint resection on the claimant. The

procedure was successful, and the claimant once again began rehabilitation at Dynamic Performance Physical Therapy. (R. 1063, 1067).

The claimant progressed well in physical therapy, generally improving his range of motion from week to week. The claimant reported that the pain in his shoulder returned during physical therapy. The physical therapy records reflect that the claimant's reports of pain fluctuated throughout his treatment. The physical therapy daily note for September 7, 2010 states that the claimant had a decreasing pain level of 5/10. At his therapy on September 21, 2010, the claimant had "little complaint of pain." On September 30, 2010, however, the claimant reported his pain to be 7/10. (R. 693, 935–937, 992, 996).

The claimant wrote to Dr. John Greco on March 12, 2011 to request that he amend his medical record to show that he had suffered a work-related injury.[2] Dr. Greco declined this request, noting that the claimant did not initially present the injury as work-related and that his examination of the claimant yielded "no identifiable mechanism of injury." (R. 1058).

The claimant does not appear to have received any further treatment until October of 2011. On October 25, 2011, Dr. Shelinder Aggarwal noted in a medical summary that evidence existed of mild to moderate carpal tunnel syndrome in the claimant's bilateral upper extremities, with the right side being worse than the left. Dr. Aggarwal recommended carpal tunnel syndrome splints and modification of activities involving the claimant's hand. If the claimant's symptoms did not subside, Dr. Aggarwal suggested a repeat of the studies in six months. (R. 1056).

Dr. Aggarwal saw the claimant several times over the following months and diagnosed him with chronic pain syndrome. Dr. Aggarwal prescribed a series of narcotics and other medications, including Trazodone, Contin, Morphine, Lortab, Ambien, and Restoril. The

---

[2] The Administrative Law Judge's opinion incorrectly identifies this correspondence as being from Dr. Morris Seymour. (R. at 78).

claimant denied any side effects from the medications and said they were helping alleviate the pain, but that he still had "good and bad days." (R. 1317–34).

On November 11, 2011, the claimant reported to Dr. Aggarwal that his pain was currently an 8/10 on the pain scale and would go as high as 10/10. The claimant also stated that the procedure performed by Dr. Greco had produced minimal benefit. Dr. Aggarwal also noted that lifting, sitting, or standing for prolonged periods were aggravating factors, while rest and medication were alleviating factors. The claimant's motor strength was assessed to be a 5/5 bilaterally. The claimant's reflexes were 2+. On November 29, 2011, the claimant went for a follow-up visit. The claimant's motor strength was 4/5 in the left arm and his reflexes were 2+. The claimant's range of motion was limited by 25% in the cervical spine. (R. 1317, 1332).

Two of the claimant's doctors, Dr. Hicks and Dr. Aggarwal, completed Physician Medical Source Statements. Dr. Aggarwal completed his assessment on November 28, 2011. Dr. Aggarwal restricted the claimant to lifting and carrying ten pounds with his right hand; was not to lift or carry with his left hand at all; could stand and walk for fifteen to twenty minutes at a time, for a total of one to two hours per day; could sit for thirty minutes at a time for up to four hours each day and needed to lie down for a period each day; occasionally pushing or pulling, using his right or left arm, stooping, reaching, or kneeling; should never engage in climbing, balancing, crouching, or crawling. (R. 1312–13).

Dr. Hicks completed his assessment on December 1, 2011. Dr. Hicks's statement is nearly identical to the form completed by Dr. Aggarwal. Both statements even have the same handwritten notes in the margins noting the claimant could not use his left hand and restricting the claimant's ability to carry or lift ten pounds occasionally to his right hand only. The only difference on the forms is that Dr. Hicks suggests the claimant needs to lie down three to four

hours a day for one hour after taking medication and Dr. Aggarwal says the claimant needs to lie down two or three times a day for fifteen minutes. (R. 1313–14).

On February 27, 2012, Dr. Usha Kiran Nuthi performed a consultative examination at the request of the Social Security administration. Dr. Nuthi assessed that the claimant could occasionally carry and lift up to ten pounds; could also sit for a half hour at a time; stand for up to forty-five minutes; walk for up to fifteen minutes; and could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl but should never climb ladders or scaffolds. (R. 1346–71).

Dr. Nuthi indicated that the claimant did not need a cane or wheelchair to ambulate. Dr. Nuthi stated that the claimant was capable of sorting files, preparing a simple meal, shopping, and walking a block at a reasonable pace. However, Dr. Nuthi did note that the claimant could not travel without a companion or use standard public transportation. Dr. Nuthi stated that the claimant could occasionally operate a vehicle, but noted that the claimant did not drive because of two D.U.I. offenses. (R. at 1352–56).

On April 23, 2012, Dr. Bacon was deposed by the claimant's attorney for the claimant's worker's compensation claim. In the deposition, Dr. Bacon testified that he did not believe the claimant would be able to lift more than five pounds following the surgery performed by Dr. Greco. Dr. Bacon testified further that the claimant should not use his arm at shoulder height or above, or engage in any repetitive activity with his left arm. The total impairment as a result of the survey, Dr. Bacon stated, was seven percent in the upper extremity and four percent for the total body. Dr. Bacon testified that the claimant would likely never improve and would remain subject to these restrictions. (R. 1395, 1399).

*The ALJ Hearings*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ on December 14, 2011. (R. 162–202). Because of the complexity of the case and the availability of new evidence, a second hearing was held on May 23, 2012. (R. 95–161).

A.    *First Hearing*

At the initial hearing in December, the only two witnesses were the claimant and the vocational expert, Lamar Crocker. The claimant testified that he graduated high school, attended a year of college, and went to trade school for welding. The last job the claimant worked was as a finisher/inspector at PPG. The claimant stated that he ceased working in that position after suffering an on-the-job injury and was pursuing a worker's compensation claim. The claimant testified that he had received unemployment benefits beginning in November 2010. While the claimant had continued to apply for employment, he stated that all of his prospects had rejected him because of the medication he was taking. (R. 167–78).

The claimant stated that he became disabled on August 18, 2010—the last day of his previous job. The claimant testified that he could eat with a fork, brush his teeth, and tie his shoes. When asked why he was unable to work, the claimant said it was because of his "chronic pain." This pain, the claimant stated, prevented him from focusing on tasks and made him forgetful. When the claimant engaged in pinching or gripping activities with his right hand, he stated that it would become numb and he would lose feeling. (R. 169–171, 179–182).

The claimant testified that he had been under the care of Dr. Aggarwal since 2009 and that Dr. Hicks was his personal physician. These doctors, the claimant said, had treated him since he stopped working. (R. 176, 183).

The claimant testified that he was able to drive to the doctor's office and the grocery store unassisted; unable to walk more than 200 feet; and that preparing a meal for himself was risky. At the time of the first hearing, the claimant was taking Hydrocodone, morphine, and Troxidol to manage his pain and additional medication to manage his diabetes and high cholesterol. At the hearing, the claimant was wearing a neck brace prescribed by Dr. Aggarwal, which he said he wore for five to six hours a day. (R. 168–69, 174, 180).

Lamar Crocker, the vocational expert, testified that the claimant was unable to return to his previous position as a finisher/inspector because that work required a "medium" level of exertion and the claimant was only capable of performing light work. Mr. Crocker stated, however, that jobs existed that the claimant was capable of performing even with his restrictions, such as a small products assembler, a remnant sorter, or a garment folder. (R. 194–96).

Mr. Crocker reviewed the functional assessments prepared by Dr. Hicks and Dr. Aggarwal and testified that if the limitations listed in those documents were accurate, the claimant could perform no jobs. The basis of Mr. Crocker's judgment was that the reports indicated that the claimant's left hand was unusable, likely rendering him unable to perform routine, repetitive tasks of any kind. Mr. Crocker also noted that the assessments stated that the claimant had postural problems, such as climbing and balancing, that could be a bar to any sort of employment. Further, Mr. Crocker testified that, if the claimant was experiencing the pain as he testified, he would have difficultly "complet[ing] normal work-day activities" and would render him unemployable (R. 197–201).

B.   *Second Hearing*

The claimant testified again at the second hearing on May 23, 2012. The claimant stated that he was able to drive but seldom did, could button his shirt except for the top button, could

14

tie his shoes, was able to open a doorknob, could feed himself, and brush his teeth. When asked if he could prepare a meal, the claimant said that he did not cook because his medication caused him to be forgetful. Co-workers came by the claimant's house to check on him, and family and neighbors provided his meals. (R. 102–104, 118, 122).

The claimant described his pain without medication as a "10" and "maxed out." The claimant stated he took medication five times a day; the treatment reduced his pain by half; the medication also caused side effects, such as drowsiness and nausea. The claimant said that he had to lie down three to four times daily; was only capable of walking a hundred feet; and utilized a cane and occasionally a wheelchair to move around as a result of the imbalance caused by the medication. (R. 25, 102–104, 112, 116–117).

The claimant testified that he was still looking for work and had been unable to find a new position since the last hearing. When asked why he felt he was unable to work, the claimant stated that his drowsiness, inability to balance, swollen ankles, and neck pain precluded him from finding employment. The claimant said that employers rejected him because they believed his medication to be a liability that increased the risk of injury to himself or others on the job. (R. 104–05).

The claimant testified that the limitation not to lift more than ten pounds with his right hand was the result of carpal tunnel syndrome resulting from repetitive motion at his previous job. The claimant stated that he had performed repetitive work such as drilling, sanding, gripping, and pinching for twenty-four years with both his left and right hands and arms. The restrictions detailed in Dr. Hicks and Dr. Aggarwal's assessments, the claimant testified, accurately reflected his physical condition and abilities. (R. 108–10).

Next Dr. Allan Neil Levine, the medical expert, testified. Dr. Levine never treated the claimant but had reviewed his medical records before giving his testimony. Dr. Levine asked the claimant questions about his daily routines and pain. After concluding his questioning, Dr. Levine offered his medical opinion of the claimant's condition. While the claimant testified that the side effects of his medication forced him to use a cane or wheelchair, Dr. Levine noted that Dr. Aggarwal's own treatment notes listed the claimant as having "no side effects" from the medication. (R. 119, 120–28, 1317).

Dr. Levine pointed out several other inconsistencies between the claimant's testimony, the medical records, and Dr. Hicks and Dr. Aggarwal's notes and assessments. Dr. Levine testified that he believed the claimant suffered from chronic neck pain, secondary to degenerative disc disease, spondylitis, and two small disc protrusions on the cervical cord. In support of his assessment, Dr. Levine pointed to an MRI that noted all of those conditions but had no evidence of spinal cord or root compromise. In Dr. Levine's view, Dr. Seymour's diagnosis of cervical stenosis was unsupported by the objective medical evidence. (R. 128, 435).

Dr. Levine stated that he found "no real clinical evidence" in the record of carpal tunnel syndrome other than the electrical studies. Dr. Levine based this opinion on the fact that Dr. Aggarwal's treatment notes stated that the claimant's motor skills were "5/5" and his reflexes were normal. While Dr. Aggarwal did note a "slight weakness" of the left arm resulting in motor skills at "4/5," such a mild weakness was not consistent with carpal tunnel syndrome in Dr. Levine's view. Further, Dr. Levine noted that the claimant was negative for Tinel's sign, a key indicator of carpal tunnel syndrome.  (R. 130, 1119–20, 1317–19, 1332–34).

Regarding the claimant's back pain, Dr. Levine stated that every assessment of the claimant's back had shown normal strength, sensation, and reflexes. Further, Dr. Levine

expressed doubt that the claimant's back issues rose to the level of a medically determinable impairment. (R. 131).

Dr. Levine also expressed doubt about Dr. Aggarwal's diagnosis of "chronic pain syndrome." Dr. Levine stated that the record contained no evidence of extreme loss of fine and gross manipulation of the shoulders and hands or spinal cord damage. While Dr. Pitts had noted some possible decreased sensation, such a finding was inconsistent with other examinations and the lack of electrical evidence of nerve compromise. (R. 131–32).

The ALJ asked Dr. Levine about the functional assessments submitted in this case and noted that the report of Dr. Aggarwal and Dr. Hicks were "virtually identical." While acknowledging that deference is owed to the judgment of treating physicians, Dr. Levine stated he did not see "the objective reasoning for the significant limitations that they placed of the claimant . . . based on the objective findings in the medical record." (R. 133–34).

In Dr. Levine's opinion, the claimant should be capable of lifting twenty pounds occasionally and ten pounds frequently; could sit six out of eight hours, stand for four out of eight hours, and walk for four out of eight hours; could occasionally use stairs, kneel, and crouch, but should avoid crawling, dangerous equipment, pushing and pulling with the left shoulder, or reaching above his shoulder; avoid forceful pinching or grasping. The claimant, in Dr. Levine's judgment, could type for thirty minutes at a time and had no limitations for fine and gross manipulation of his upper extremities, permitting him to engage in activities like sorting, filing, or taking tickets. (R. 134–35).

Next the claimant's sister, Ophelia Davis, testified. Ms. Davis stated that she sees the claimant nearly every day, cooks for him, and drives him places because she does not believe he is capable of driving himself. Ms. Davis testified that she has never seen the claimant performing

significant physical or labor-intensive activity and said he was currently unable to use his hands. Further, Ms. Davis testified that she had never seen the claimant act in a manner inconsistent with his alleged disability. (R. 141–45).

The final witness of the second hearing was James Hayer, the vocational expert. Mr. Hayer testified that the claimant could not return to his previous position and that none of the skills from that job would translate to light work or sedentary employment. The ALJ then asked Mr. Hayer what jobs a hypothetical person could perform who was the age, had the education and prior work history of the claimant, and had the restrictions suggested by Dr. Levine. Mr. Hayer testified that such a person would be able to perform several sedentary positions, including an information clerk, which has 10,0000 positions in Alabama and 900,000 nationally; including an order clerk for food and beverage, which has 2,700 positions in Alabama and 170,000 nationally; and a call-out operator, which has 910 positions in Alabama and 67,000 nationally. (R. 149–50).

The ALJ next asked Mr. Hayer if light work jobs existed that the hypothetical individual could perform. Mr. Hayer initially answered no because he did not believe that Dr. Levine's restrictions permitted standing for six out of eight hours of the day. Upon further examination, however, Mr. Hayer noted that Dr. Levine's restrictions permitted standing for four hours and walking for fours, totaling eight hours a day. Accordingly, Mr. Hayer testified that the hypothetical individual could perform several light work job, including a storage facility rental clerk, which has 3,000 positions in Alabama and 400,000 nationally; an usher, which has 580 positions in Alabama and 100,000 nationally; and a mail clerk, which has 1,700 positions in Alabama and 120,000 nationally. Mr. Hayer also identified two sit-and-stand jobs that the hypothetical individual could perform: a ticker taker, which has 300 positions in Alabama and

18

50,000 nationally, and an arcade attendant, which has 3,000 positions in Alabama and 40,000 nationally.

When asked by the claimant's attorney to assume the limitations laid out in Dr. Hicks and Dr. Aggarwal's assessment, Mr. Hayer testified that no work exists that the claimant would be able to perform with those limitations, as it would be impossible to find a job where it was permitted to lie down two to three times a day for fifteen minutes at a time. (R. 159–60).

*The ALJ's Decision*

On June 15, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. The ALJ found that the claimant met the insured status requirement of the Social Security Act and had not engaged in substantial gainful activity since the alleged onset of his disability on August 18, 2010. The ALJ also found that the claimant suffered from several severe impairments: chronic neck pain secondary to mild degenerative disc disease of the cervical spine; spondylosis; obesity; chronic left shoulder pain; and carpal tunnel syndrome. (R. 74–77).

The ALJ next found that the claimant did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Regarding the claimant's shoulder pain and mild degenerative disc disease of the cervical spine, the ALJ found that the record failed to reflect that the claimant's impairments were accompanied by any of the findings detailed in Listing 1.02 (major dysfunction of a joint) and Listing 1.04 (disorders of the spine). Relying on Dr. Levine's assessment that no evidence of spinal cord or root nerve compromise existed, the ALJ found that the claimant failed to demonstrate the abnormalities necessary to satisfy the listing criteria. (R. at 80–81).

The ALJ found that the claimant possessed the residual functional capacity to perform light work. While conceding that the claimant could not perform all types of work, the ALJ determined that the evidence showed that he could perform work that required light exertion. The ALJ found that the claimant could lift and carry twenty pounds occasionally and lift and carry ten pounds frequently, but should not lift above his shoulder; sit for six out of eight hours with customary breaks, but should not look above the horizon; stand and walk for four out of eight hours with customary breaks; occasionally navigate stairs with a railing; occasionally kneel, crouch, and stoop but not repetitively; he should not crawl; should avoid ladders, heavy vibratory machinery or equipment, unprotected heights or extreme cold exposure; should not be pushing or pulling with the left upper extremity or reaching above shoulder level; he should avoid forceful pinching, grasping, or torque activities with the upper extremity; and use a keyboard but not more than thirty minutes at a time with a one or two minute break. The ALJ found that the claimant had no limitations in the use of his upper extremities that would preclude him from performing sorting, filing, counting change, taking tickets, or sitting at a desk. The ALJ based his residual functional capacity on the testimony of Dr. Levine and the vocational expert. (R. 81–82).

The ALJ then applied the pain standard articulated in *Landry v. Heckler* to assess the claimant's subjective complaints of pain. The *Landry* standard requires evidence of an underlying medical condition, and either objective medical evidence that confirms the severity of the alleged pain, *or* that the objectively determined medical condition is of such a severity it may be reasonably expected to give rise to the claimant's alleged pain. 782 F.2d 1551, 1553 (11th Cir. 1986). (R. 82–83). The ALJ considered the claimant's subjective complaints of pain and noted that possible sources of the alleged disabling pain could possibly prevent the claimant

from performing the functional capacity assigned him, but ultimately found that claimant's testimony regarding the intensity, persistence, and limiting effects of his pain was not credible as neither of the second prongs of the *Landry* test were satisfied.

First, the ALJ considered the claimant's allegation that he was unable to work due to pain in his arms and fingers. The ALJ noted that Dr. Aggarwal determined that the record contained evidence that the claimant suffered from only mild to moderate carpal tunnel syndrome. To treat the claimant's carpal tunnel syndrome, Dr. Aggarwal prescribed a conservative course of treatment—splints and behavior modification. The ALJ also noted the claimant's testimony concerning his daily activities contradicted his claim of disabling pain. The ALJ pointed to the testimony of the claimant that he was capable of driving, brushing his teeth, using a fork, buttoning buttons, and tying his shoes. While the claimant testified that he required a cane to walk, the ALJ noted medical records that showed that the he had a normal gait. Further, the ALJ noted that the claimant had applied for unemployment benefits, which requires stating that the applicant is capable and willing to work. (R. 83).

The ALJ also found the claimant's contention that he suffered from debilitating side effects from his medication to be similarly without merit. The ALJ noted that no evidence in the record showed that the claimant ever complained of side effects from his medication. On the contrary, the ALJ cited to evidence in the record that the claimant had told Dr. Aggarwal that he was experiencing no side effects from the medication he was taking. (R. 83–84).

Second, the ALJ considered whether the claimant's back pain was disabling. While acknowledging that the claimant had been diagnosed with cervical degenerative disc disease, the ALJ stated that the condition had demonstrated improvement when treating with cervical injections and had only produced mild limitations on the claimant's strength and range of

21

motion.  Further, the ALJ noted that despite the claimant's allegations of disabling pain in his back and neck, he had only received conservative treatment for the condition. (R. 84).

Third, the ALJ considered the claimant's allegations of disabling pain in his left shoulder. Again, the ALJ acknowledged that the claimant had an underlying condition, but found that that the objective evidence in the record did not support the claimant's claims of the pain's severity. Despite claiming to experience severe pain after his surgery in 2010, the ALJ noted that claimant never returned to Dr. Greco and discontinued his physical therapy. Accordingly, the ALJ determined that the claimant's subjective claims of pain did not support a finding that he was disabled. (R. 84).

In reaching his decision on the claimant's functional capacity, the ALJ placed significant weight on the testimony of Dr. Levine and adopted his assessment of the claimant's capabilities. The ALJ discredited opinions that conflicted with Dr. Levine's testimony. The ALJ assigned partial weight to the consultative examination performed by Dr. Nuthi to the extent that it did not conflict with Dr. Levine's testimony. The ALJ assigned little weight to Dr. Bacon's deposition because he viewed it as inconsistent with the objective medical evidence and Dr. Levine's testimony. Specifically, the ALJ discredited Dr. Bacon's testimony since his extreme limitations for the claimant could not be squared with his assessment that the claimant suffered from a seven percent impairment of the upper body and a four percent impairment of the body as whole. (R. 78–80, 84).

Further, the ALJ rejected the opinions of treating physicians Dr. Hicks and Dr. Aggarwal as reflected in the Physical Medical Source Statements submitted. While acknowledging that substantial weight is usually accorded to statements from a treating physician, the ALJ found

that the statements of Dr. Hicks and Dr. Aggarwal were not well supported and, therefore, not entitled to great weight for three reasons. (R. 85).

First, the statements failed to provide clinical data and contained little explanation of the medical evidence and the restrictions. Accordingly, the ALJ found that that the opinions submitted by Dr. Hicks and Dr. Aggarwal were unpersuasive as the sections provided for objective support were left blank. The ALJ also stated that the opinions contained inconsistences.  The ALJ did not identify specific inconsistencies, but one is apparent on the forms submitted. Dr. Hicks and Dr. Aggarwal indicated that the claimant was not to use his left hand, but stated that he could occasionally pull and push with his left arm. (R. 85).

Second, the ALJ found that Dr. Hicks and Dr. Aggarwal relied heavily upon the subjective complaints of the claimant, despite good reason to doubt his assertions. The ALJ said that Dr. Hicks and Dr. Aggarwal "uncritically accept[ed]" the claimant's reports of his pain. The ALJ referenced his previous discussion of the evidence of the intensity of claimant's pain to demonstrate that good reason existed to be skeptical of the claimant's account of his subjective symptoms (R. 85).

Third, the ALJ discredited the statements of Dr. Hicks and Dr. Aggarwal because Dr. Hicks apparently relied heavily on Dr. Aggarwal's statement in preparing the form as the limitations were identical, including handwritten notations in the margins that claimant "cannot use left hand" and limiting one restriction to the "right hand only." (R. 85).

The ALJ found that the claimant was unable to perform any past relevant work. However, the ALJ determined that jobs that the claimant could perform existed in significant numbers in the national economy. The ALJ acknowledged that the claimant lacked the ability to perform the full range of light work, but cited the testimony of the vocational expert who

testified that the claimant could perform the functions of the follow sedentary jobs: an information clerk, which has 10,000 positions in Alabama and 900,000 nationally; an order clerk which has 2,700 positions in Alabama and 170,000 nationally; or a call out operator which has 910 positions in Alabama and 67,000 nationally. (R. 86–87).

After considering the claimant's age, education, work experience, and residual functional capacity, the ALJ found that the claimant was capable of successfully adjusting to other work such as these occupations. Accordingly, the ALJ concluded that the claimant was not disabled for purposes of the Social Security Act and was, therefore, not entitled to disability benefits or supplemental income under that act. (R. 86–87).

## VI. DISCUSSION

The claimant argues that the ALJ failed to accord proper weight to the testimony of the claimant's treating physicians, did not accord proper weight to the claimant's own testimony concerning his pain and ability to work, and failed to correctly apply the Medical-Vocational Rules. This court, however, finds that the ALJ applied the appropriate legal standards to his evaluations of the claimant's subjective complaints and the opinions of his physicians, correctly applied the Medical-Vocational Rules, and substantial evidence supports the ALJ's decision.

*Issue One: The ALJ's Assessment of the Claimant's Credibility*

The ALJ made two judgments on the claimant's credibility that the claimant argues are error. First, the claimant argues that the ALJ did not lend credence to the claimant's subjective accounts of his pain. Second, the the claimant argues that the ALJ discounted the claimant's credibility since he applied for and received unemployment benefits, a process which requires stating under penalty of perjury that one is able and willing to work. In both instances, the ALJ applied the proper legal standard and substantial evidence supports his decision to discount the

claimant's credibility.

*A.      The Claimant's Subjective Testimony Regarding His Pain*

When assessing claimant's claims of disability because of pain, this court must assess whether the record contains "evidence of an underlying medical condition" and such a condition is either reasonably expected to give rise to the claimant's pain *or* the claims of pain resulting from the condition are supported by objective medical evidence in the record. *Holt*, 921 F.2d at 1223. When an ALJ discredits the claimant's subjective testimony, he must specifically articulate the reasons he is doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). An ALJ may discredit a claimant's testimony after considering the daily activities of the claimant and finding them to be irreconcilable with the alleged pain. *Harwell*, 735 F.2d at 1293. If the ALJ does not articulate specific reasons for discrediting a claimant's subjective testimony, however, the court must accept the testimony as true. *Holt*, 921 F.2d at 1236.

The ALJ properly articulated the pain standard and applied it to the facts of this case. The ALJ considered the claimant's claims of pain regarding each of his underlying conditions. The ALJ acknowledged that the claimant had several underlying conditions. For each condition, the ALJ provided specific reasons for why he was discrediting the claimant's subjective testimony regarding his pain and limitations. Generally, the ALJ noted that the claimant's claims of pain were inconsistent with his application for unemployment benefits, which requires a statement that the person is willing and able to work. As discussed subsequently, the ALJ was entitled to consider this fact in weighing the claimant's credibility.

Regarding the claimant's pain in his hands and arm, the ALJ found that mild to moderate carpal tunnel syndrome would not naturally result in the debilitating pain the plaintiff claimed. This finding is supported by the testimony of Dr. Levine relied upon by the ALJ. Dr. Levine

reviewed all of the claimant's medical records and noted that the objective evidence pointed away from carpal tunnel syndrome being a cause of the claimant's pain. Nothing in the record shows that the claimant was ever diagnosed with anything more than the possibility of moderate carpal tunnel syndrome by any physician.

Further, as the ALJ noted, the claimant testified that he was capable of buttoning buttons, extending his arms, and using his hands and arms in many other daily activities.  Such tasks are inconsistent with the intense and limiting pain the claimant claims. Therefore, substantial evidence supports the ALJ's decision that no objective evidence existed to corroborate the claimant's claims of pain and that his potential underlying condition of carpal tunnel syndrome could not reasonably be expected to give rise to the substantial limitations he now claims.

The ALJ properly acknowledged that the claimant's back and neck pain was an underlying condition that potentially could cause the symptoms claimed. As before, however, substantial evidence supports the ALJ's decision that neither the objective medical evidence corroborated the claimant's testimony regarding the severity of his pain nor could the claimant's back condition be reasonably expected to produce the pain claimed.

As the ALJ correctly found, the claimant's testimony concerning his pain was not supported by the medical records that show the claimant's strength, reflexes, and sensation were all relatively normal and the MRI showed no evidence of spinal cord or nerve root compromise. Further, as Dr. Levine testified, the claimant's disc degeneration would not reasonably be believed to result in such debilitating pain. Therefore, substantial evidence supports the ALJ's decision that the claimant's testimony concerning his back pain failed to satisfy the second prong of the pain standard.

The ALJ also considered the claimant's underlying shoulder condition. Dr. Levine noted,

and the ALJ relied upon, the fact that no objective evidence existed in the record of extreme loss of fine and gross manipulation of the upper extremities, as the claimant's testimony regarding the limiting effects of his pain would suggest. Additionally, as the ALJ noted, the claimant discontinued therapy and did not return to see Dr. Greco after his surgery despite claiming to be in intense pain. The claimant's inconsistences coupled with Dr. Levine's testimony constitute substantial evidence that supports the ALJ's decision that the claimant failed to show either that his shoulder impairment could generally be expected to produce the intense pain claimed or that the medical records supported his assertions.

Accordingly, this court finds that substantial evidence supports the ALJ's decision that the claimant's subjective complaints were not fully credible. Therefore, the ALJ properly discredited the claimant's testimony.

### B.     The Claimant's Application for Unemployment Benefits

The claimant argues that the ALJ erred by discrediting the testimony of the claimant because he had applied for and received unemployment benefits. In support, the claimant cites an Alabama Court of Appeals case holding that a worker was not estopped from seeking disability benefits under Alabama's Worker's Compensation Act by applying for unemployment benefits, which required stating he was willing and able to work. *See White Tiger Graphics, Inc. v. Clemons*, 88 So. 3d 908, 910–11 (Ala. Civ. App. 2012).

*White Tiger Graphics* is not controlling on this court, and its persuasive value is minimal in this case as it involved construing Alabama's Worker's Compensation Act, and not the federal Social Security Act. The ALJ did not determine that the claimant was entirely estopped from seeking disability benefits. Rather, the ALJ found that applying for unemployment benefits undermined the claimant's *credibility* in asserting his claim for Social Security disability

benefits. Accordingly, the reasoning of *White Tiger Graphics* is not applicable in this case.

In his reply brief, the claimant directs the court's attention to the fact that the Supreme Court has held that no inherent conflict exists between claims under the Americans with Disabilities Act and claims for unemployment benefits. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). The claimant's reliance on *Cleveland*, however, is selective and similarly unpersuasive. The Court in *Cleveland* reasoned that no inherent, inevitable conflict exists between a claim under the ADA and a claim for disability benefit to justify a court applying a "special negative presumption" against a subsequent claim. *Id*. at 803. The Court held that a disability claim does not *automatically* preclude a later ADA claim, but "[n]onetheless, in some cases an earlier [disability claim] may turn out to genuinely conflict with an ADA claim." *Id*. at 805 (emphasis in original).

In fact, *Cleveland* supports the ALJ's decision. While *Cleveland's* reasoning may prevent an ALJ from discarding a claim of disability solely on the basis of a separate claim under another statute that requires a statement testifying to the claimant's ability and desire to work, the ALJ did not do that in this case. Rather, the ALJ assessed the statement as a larger component of the claimant's credibility and considered whether the competing claims were truly in conflict. Such an analysis is precisely what *Cleveland*'s reasoning directs. Therefore, the ALJ properly considered the claimant's statement regarding his desire and ability to work in his application for unemployment benefits as a factor in assessing his credibility.

*Issue Two: The ALJ's Assessment of the Treating Physicians' Opinions*

On appeal, the claimant contends that the ALJ erred in determining the functional capacity of the claimant by failing to accord the opinions of Dr. Hicks and Dr. Aggarwal, the claimant's treating physicians, substantial weight, electing instead to rely on the testimony of the

medical expert, Dr. Levine, who had never treated or met the claimant and only reviewed his medical records.

The ALJ must give the testimony of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford*, 363 F.3d at 1159. The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock*, 764 F.2d at 835. When the commissioner discredits the opinion of a treating physician, he must articulate the specific reasons why the treating physician's opinion should not be controlling. *Lewis*, 125 F.3d at 1440. An ALJ may properly discredit a treating physician's opinion when it is not supported by the evidence, the opinion is conclusory, or it is inconsistent with the doctor's own medical records. *Lewis*, 125 F.3d at 1440

The ALJ applied the proper legal standard to the opinions offered by Dr. Hicks and Dr. Aggarwal, recognizing that generally they should be given substantial weight. The ALJ then articulated a specific reason for discrediting Dr. Hicks and Dr. Aggarwal's opinions: that the opinions were not well supported by the medical evidence. Substantial evidence supports this decision.

As noted by the ALJ, Dr. Hicks and Dr. Aggarwal failed to support their opinions of the claimant's functional capacity with any reference to the claimant's medical records. *See* 20 C.F.R. § 416.927(c)(3) ("[T]he weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."). Dr. Hicks and Dr. Aggarwal did not even list the claimant's impairments when laying out their restrictions for the claimant. Dr. Levine, the medical expert, testified that he saw no objective reason in the medical record for the substantial limitations placed on the claimant by Dr. Hicks and Dr. Aggarwal.

Further, as the ALJ also noted, both functional assessments contain inconsistences.

Despite the fact that both Dr. Aggarwal and Dr. Hicks said the claimant should not use the left hand at all on one place of the form, they indicated he was capable of occasionally pushing and pulling with his left arm at another. *See* (R. at 1313–1314).

The claimant argues that Dr. Aggarwal and Dr. Hicks's opinions are supported by their treatment notes. Specifically, the claimant observes that both physicians recorded occasions where the claimant was experiencing significant pain—an eight out of ten on the pain scale. However, this argument ignores that the claimant subsequently reported that the medication prescribed by Dr. Aggarwal helped alleviate his ailments without producing side effects.

Substantial evidence also supports the ALJ's decision to rely on Dr. Levine's testimony. Dr. Levine provided clear explanations for his assessment and supported his restrictions with reference to the objective medical records. The ALJ was justified, therefore, in according Dr. Levine's testimony substantial weight. *See* 20 C.F.R. § 416.927 ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.").

Therefore, the ALJ applied the proper legal standard to evaluate the opinions of Dr. Hicks and Dr. Aggarwal. Though treating physicians' opinions are typically controlling, they are not when they are not well supported. Substantial evidence in the form of the opinions themselves, the medical records, and Dr. Levine's testimony supports the ALJ's decision to discredit the opinions of Dr. Hicks and Dr. Aggarwal.

*Issue Three: The ALJ's Application of the Medical-Vocational Rules*

The claimant argues that the ALJ failed to follow the Medical-Vocational rules ("grid rules") when determining whether the claimant is disabled. The claimant contends that his

functional capacity, age, education, and work experience mean that he should be found disabled under grid rule 201.14.

The grid rules should not be used when the claimant is unable to perform a full range of work at a functional level or when the claimant has non-exertional impairments that significantly limit basic work skills. *Gibson*, 762 F.2d at 1520. Instead, the ALJ should typically solicit the testimony of a vocational expert.  *Francis*, 749 F.2d at 1566. An ALJ may rely on the testimony of a vocational expert to establish that the claimant has the ability to adjust to other work in the national economy. *Richter*, 379 F. App'x at 960.

Because the ALJ found that the claimant could not perform a full range of work at a functional level, the ALJ correctly sought out the testimony of a vocational expert. The ALJ posed a hypothetical question containing the claimant's restrictions to the vocational expert, who provided a list of the positions the claimant could perform. The testimony of the vocational expert, therefore, constitutes substantial evidence to support the ALJ's decision that the claimant was capable of performing jobs that existed in significant numbers in the national economy.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied the proper legal standards and substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 16th day of February, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE